FILED

IN THE UNITED STATES DISTRICT COURT 2010 SEP 30  PM 2: 32
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
                    DEPUTY

| | |
|---|---|
| HAROLD PIATT, | § |
| PLAINTIFF, | § |
| | § |
| V. | § |
| | § |
| CITY OF AUSTIN, | § |
| TOBY FUTRELL, IN HER OFFICIAL | § |
| CAPACITY AS CITY MANAGER | § |
| OF THE CITY OF AUSTIN, | § |
| STANLEY L. KNEE, IN HIS OFFICIAL | § |
| CAPACITY AS POLICE CHIEF OF | § |
| THE CITY OF AUSTIN AND IN HIS | § |
| INDIVIDUAL CAPACITY, AND | § |
| ART ACEVEDO, IN HIS OFFICIAL | § |
| CAPACITY AS POLICE CHIEF | § |
| OF THE CITY OF AUSTIN, | § |
| DEFENDANTS. | § |
| | § |

CAUSE NO. A-07-CA-520-LY

## MEMORANDUM OPINION AND ORDER

Before the Court is the above styled and numbered action.  Plaintiff Harold Piatt brings this

discrimination action complaining that in 2003 and 2006 the Defendant City of Austin's (the "City")

former Chief of Police, Stanley Knee ("Knee"), improperly passed over Piatt, a Caucasian, for

appointment to Assistant Chief of Police for the City's Police Department (the "Department") and

instead promoted Charlie Ortiz, a Hispanic-American.  Piatt alleges claims of disparate treatment

based on race against Defendants the City, former City Manager Toby Futrell, and the City's current

Chief of Police Art Acevedo in their official capacities, and alleges that they engaged in racial

discrimination in violation of Title VII of the 1964 Civil Rights Act, as amended,[1] Title 42 United

---

[1] *See* 42 U.S.C. §§ 2000(e) - 2000(e)-17 ("Title VII").

States Code section 1983,[2] the Texas Commission on Human Rights Act,[3] and the City's Unlawful

Employment Practices ordinance.[4] Piatt also alleges race-discrimination claims against Futrell and

Knee in their individual capacities. *See* 42 U.S.C. § 1983. Defendants moved for summary

judgment as to all of Piatt's claims. After considering the United States Magistrate Judge's Report

and Recommendation (Clerk's Document No. 64), the Court granted the motions in part and denied

them in part on December 3, 2008 (Clerk's Document No. 68).[5] The Court left for trial: (1) Piatt's

---

[2] 42 U.S.C. § 1983 ("Section 1983").

[3] *See* Tex. Labor Code Ann. §§ 21.001-.556 (West 2006 & Supp. 2010) ("TCHRA"). The purpose of the TCHRA is to coordinate state law with federal law in the area of employment discrimination. *See* Tex. Labor Code Ann. § 21.001 (1)-(2) (West 2006); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005) (observing no meaningful distinction between analysis under Title VII and TCHRA).

[4] *See* Austin, Tex., Austin City Code § 5-3-3 (providing that City's local ordinances instruct that they should be interpreted consistently with federal court interpretation of Title VII and TCHRA).

[5] The Court granted a portion of Knee and Futrell's motion for judgment and held that Piatt take nothing on his claims against Futrell in her individual capacity. Additionally, the Court granted Defendants' motion for summary judgment with regard to Piatt's claims regarding Knee's 2003 Assistant Chief appointment decision, holding that those claims were barred as a matter of law by the applicable statute of limitations (Clerk's Document No. 68). *See* 42 U.S.C. § 2000e-5(e)(1).
By the same Order, the Court denied Knee's motion for summary judgment on his affirmative defense of qualified immunity, which Defendants took by interlocutory appeal to the United States Court of Appeals for the Fifth Circuit (Clerk's Document No. 73). The Fifth Circuit held that an issue of material fact exists as to whether Knee is entitled to qualified immunity, dismissed the appeal for lack of jurisdiction, and remanded the action to this Court. *Piatt v. City of Austin*, No. 08-51279, 2010 WL 1976571 (5th Cir. May 18, 2010) (unpublished); (Clerk's Document No. 84).
Following remand, Piatt moved this Court: (1) to reconsider the portion of the December 3, 2008 order on summary judgment that held that the 2003 hiring decision was barred by the statute of limitations; and (2) for leave to file a Second Amended Complaint (Clerk's Document Nos. 88 & 92) contending that both actions are appropriate due to a change in the law that occurred while the interlocutory appeal was pending. Specifically, Piatt contended that because of the change in the law, his claims regarding Knee's 2003 Assistant Chief appointment decision are no longer barred by statute of limitations. The Court denied both of Piatt's requests (Clerk's Document No. 95).

claims against the City and those Defendants sued in their official capacities regarding Knee's 2006 decision not to promote Piatt and alleging disparate-treatment race discrimination in violation of Title VII, Section 1983, TCHRA, and the City's Unlawful Employment Practices ordinance; and (2) Piatt's Section 1983 claim against Knee, in his individual capacity, for his decision not to promote Piatt in 2006.

The action proceeded to a bench trial that commenced September 13, 2010, and concluded September 15, 2010.[6] Having considered the evidence presented at trial, the parties' Joint Stipulated Facts (Clerk's Document No. 111), the arguments of counsel, and the applicable law, the Court renders this memorandum opinion and order.[7]

*Jurisdiction and Venue*

The Court has jurisdiction over this action because Piatt raises issues involving federal statutory provisions. *See* 28 U.S.C. § 1331. Venue is proper in the Austin Division of the Western District of Texas, because a substantial part of the events or omissions related to Piatt's claims arose within this district. *See* 28 U.S.C. § 1391(a), (b).

*Joint Stipulated Facts*

The City is a "home-rule" municipality, organized and incorporated under the laws of the State of Texas. *See* Tex. Const. art. 11, § 5; *see also* Tex. Loc. Gov't Code Ann. §§ 51.071-.079

---

[6]    Although Piatt's First Amended Complaint includes a jury request, during a later conference with the Court, at which all parties were represented by counsel, the parties agreed that the action proceed to trial without a jury.

[7]    This Memorandum Opinion and Order shall constitute the Court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a). All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

3

(West 2008). Knee was the Department's Chief from October 16, 1997, until June 4, 2006, when he left the Department. The City Council establishes the number of Assistant Chief positions available to the Department, but lacks the authority to select the individuals who will serve as Assistant Chiefs. *See* Tex. Loc. Gov't Code Ann. § 143.014 (West 2008) (appointment and removal of person classified immediately below department head; here Assistant Chiefs). The Chief selects and appoints the Assistant Chiefs, and his selection is limited only by the Texas Local Government Code and any applicable provisions of a labor agreement. *See id.* at .014(b). Unlike all other police ranks, Assistant Chiefs serve at the pleasure of the Chief and may be returned to the rank from which they were appointed at the Chief's discretion. *See id.* at .014(g). Qualifications for Assistant Chief set forth by the Texas Local Government Code are that the person appointed: (1) be employed by the City as a sworn officer; (2) have at least two years' continuous service in the Department as a sworn officer; and (3) meet the requirements for appointment as head of a police department. *See id.* at .014(d) (1-3). The requirements for appointment as head of a police department are that the appointee be eligible for intermediate level certification by the Texas Commission on Law Enforcement Officer Standards and Education and have served as a peace officer for at least five years. *See* Tex. Loc. Gov't Code Ann. § 143.013(b) (West 2008). Here, the applicable labor agreement does not add, change, or augment the qualifications required by the Texas Local Government Code. No formal application or selection process, examination, skills assessment, or interview is required. The Assistant Chief appointees named by Knee were each qualified for appointment under the Texas Local Government Code.

Although not included in the parties' stipulated facts, it is undisputed that in 2006 and currently the structure of the Department is that the Chief is the Department head and Assistant

4

Chiefs, who are outside of the civil-service advancement rules, serve directly under the Chief in an administrative and advisory capacity. Commanders are the highest civil-service employees in the Department and each Commander reports to an Assistant Chief. Lieutenants are within the civil-service structure and serve just under Commanders. Each Lieutenant serves under one Commander.

In 2003, Knee filled two Assistant Chief positions by appointing (1) Commander Robert Dahlstrom, a Caucasian, and (2) Lieutenant Cathy Ellison, an African-American. At that time, there were no African-American Commanders at the Department. In March 2006, Knee filled two Assistant Chief positions by appointing (1) Commander David Carter, a Caucasian, to replace outgoing Assistant Chief Rudy Landeros, a Hispanic-American; and (2) Commander Charlie Ortiz, to replace outgoing Assistant Chief Robert Dahlstrom. At the time Knee made his March 2006 appointments, considering only the qualifications set forth in the Texas Local Government Code, within the Department there were approximately 950 officers at all ranks who qualified for Assistant Chief, of which 18 officers were Commanders and 58 officers were Lieutenants. In March 2006, Piatt was a Commander who met the Texas statutory qualifications for Assistant Chief.

When Knee left the Department in June 2006, Futrell appointed Assistant Chief Ellison as Acting Chief of Police. Following Ellison's promotion to Acting Chief, Ellison appointed Commander Julie O'Brien, a Caucasian, to Acting Assistant Chief and Chief of Staff. Also during her tenure as Acting Chief, Ellison returned Assistant Chief Ortiz to Commander duties in January 2007 and appointed Commander Leo Enriquez, a Hispanic-American, as Assistant Chief.

The City selected Art Acevedo as Police Chief in June 2007. In July 2007, the City Council increased the number of Assistant Chief positions from three to five. In August 2007, Chief Acevedo appointed Assistant Chief David Carter to Chief of Staff, appointed Commander Al Eells,

5

a Caucasian, Commander Sam Holt, an African-American, and Commander Patti Robinson, a Caucasian, to Assistant Chiefs.  In June 2008, Assistant Chief Leo Enriquez retired from the Department and Chief Acevedo appointed Commander Jeff Adickes, a Caucasian, to Assistant Chief. In November 2009, Assistant Chief Sam Holt retired and Chief Acevedo appointed Commander Sean Mannix, a Caucasian, to Assistant Chief.  In February 2010, Assistant Chief Jeff Adickes retired from the Department and Chief Acevedo appointed Commander Johnny Hutto, a Caucasian, to Assistant Chief.  In August 2010, Assistant Chief Al Eells retired from the Department and Chief Acevedo appointed Raul Mungia, a Hispanic-American, to Assistant Chief.

Although Piatt submitted his application twice for Assistant Chief under Knee, Piatt did not apply for Assistant Chief under Acevedo.  Piatt retired in October 2007 as a Commander.  Piatt always received average or above average performance evaluations during his career with the Department.

***Other facts from trial***

At trial, Knee testified that on his arrival to the Department in 1997, he brought a different concept of police strategy to the City.  Knee wanted to create small-area commands, and, within each area, a Commander would be the manager who would allocate and determine the use of resources in the area.  Before appointing Assistant Chiefs, Knee had discussions with the City Manager, Toby Futrell, who told him that the City "desired that the organization structure [be] reflective of the community."  Knee also had discussions with the Assistant City Manager, Rudy Garza, and Knee interpreted both of these conversations "as a reminder that the City's goal was to have a diverse work force and that I should be considering that in making my decisions."  Knee explained, "I think the diversity in the work force [w]as a consideration, yes."

6

Knee testified that he used race as a factor in his Assistant Chief appointment decisions in 2003 and 2006.  With regard to Knee's 2003 appointments,

> I think it [race] was of consideration in addition to the fact that I felt clearly that both Robert [Dahlstrom] and Cathy Ellison were qualified to do the jobs and brought different sets of skills to my team.

With regard to the March 2006 appointment decisions, Knee testified,

> It [race] was a consideration but, again, taking into account the fact that I firmly believe that my appointment was not only highly capable of doing the job but would brought — bring these skills to my team at a time when I was losing some very experienced assistant chiefs, it was a time when I needed Charlie Ortiz's skills to manage that department.

Knee testified that in 2006 he considered Piatt for the Assistant Chief appointments.  At the time, Piatt was a Commander in the Department.  Knee denied that Piatt was only in contention for the Assistant Chief position vacated by David Carter.  Knee explained that in 2006 he was making two appointments and was considering a wide variety of combinations of individuals.  Knee thought that Piatt was not "the best possible candidate to fill one of those two positions."  Knee further explained,

> [Piatt] was a good commander, but as — but as chief of police, and I looked around for the needs of the department, not only he but Hinkle and — and a number of other commanders were seriously considered, but at the time none of those individuals would have been, in my opinion, as good a selection for my team as Dave Carter and Charlie Ortiz.  I don't know if [Piatt] would have been a successful assistant chief.  Based upon his past performance, I would assume in some areas he would have done well and that he would have had to have been mentored in other areas.

Further, after being asked if Knee had not considered race in his 2006 Assistant Chief appointments, who would he have promoted, Knee testified,

I would most likely have picked Charlie Ortiz. Let me explain why. We had just had a shooting in the southeast area which he [Ortiz] was the area commander. It was a very volatile time. Immediately following the shooting, I went to a community meeting that lasted for hours so I could tell the people in that community were very upset, it was a very explosive situation. I not only got to see Charlie Ortiz interact with some of the most vocal, angry people, but I got to see the people that worked for him do the same thing. Within a few weeks of that meeting, Charlie Ortiz had worked that community so well that we had a—I think it was a peace march in which we had a rally at the community center where a few weeks before people were yelling and screaming at us. Charlie had organized that event. To see the progression from some of the same people that marched with us that day, it was very impressive. When you—when you look at the pieces that go into making up a team, those are the kinds of qualities that one chief of police or one CEO needs to make sure that he's got on his team. I was losing some of the most experienced [Assistant Chief]s I had. I had lost Rick Coy the year before. I had lost—I was losing Robert Dahlstrom to the University of Texas as the chief of police. I was losing Rudy Landeros to the United Nations. We were going through—when I visualized us going through this process where it was almost like we were starting off randomly, and so I believe that the skills that Charlie displayed were skills that would clearly be needed on the fifth floor.[8]

Knee also explained that Ortiz's approachable demeanor, his ability to maintain a sense of calm, and his ability to build relationships were skills Knee considered important.

### *The applicable law—Piatt's disparate-treatment race-discrimination claim*

At issue is Piatt's disparate-treatment race-discrimination claim regarding Knee's 2006 decision to not hire Piatt as an Assistant Chief.

---

[8] Knee explained that when he refers to the "fifth floor" he is referring to that floor of the police department's building as that is the location of the Department's administrative offices of the Chief, Assistant Chiefs, and their support personnel.

A *prima facie* case of discrimination asserting disparate treatment requires that the plaintiff show: (1) he is within a protected class;[9] (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) he was replaced by someone outside the protected class or treated less favorably than similarly situated employees outside the protected class. *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.* 530 U.S. 133, 153 (2000). A plaintiff may prove the requisite intentional discrimination using either direct or circumstantial evidence. *See Lawrence v. University of Tex. Med. Branch*, 163 F.3d 309, 312 (5th Cir. 1999) (Title VII claim). Direct evidence of discrimination is evidence that proves the defendant acted with discriminatory intent, without the need for inference or presumption. *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). If direct evidence is unavailable, as is typically the case, the plaintiff may create an inference of discrimination by using the burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

Once established, the four-factor *prima facie* case raises a presumption of discrimination, which the defendant must rebut by articulating legitimate, nondiscriminatory reasons for its actions. *McDonnell Douglas*, 411 U.S. 792, 802; *Shackleford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir. 1999). This burden on the employer is only one of production, not persuasion, involving no credibility assessments. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981).

---

[9] Caucasian persons have standing to sue under Title VII for race discrimination. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976) (Title VII prohibits all racial discrimination in employment, without exception for any group of particular employees).

9

If the employer carries its burden of production, the presumption of discrimination created by the plaintiff's *prima facie* case "drops out of the picture" and the burden shifts back to the plaintiff. *St.Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12 (1993).

If defendant produces a nondiscriminatory reason for its actions, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 311-12 (5th Cir. 2004).

Here, in denying the motion for summary judgment, the Court previously determined that Piatt raised a material fact issue about whether Knee's proffered reason was only one motivating factor. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). Having considered the evidence presented at trial, particularly Knee's testimony, the Court finds that in 2006, Knee considered race in deciding whom he would appoint as Assistant Chiefs. Having made this finding, the Court continues with a mixed-motives-defense analysis.

The mixed-motives defense arises from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Garcia v. City of Houston*, 201 F.3d 672, 675-76 (5th Cir. 2000). *Price Waterhouse* holds that an employer may not be held liable if the employer "can prove that, even if it had not taken [the impermissible factor of race] into account, [the employer] would have come to the same decision regarding a particular person." 490 U.S. at 242.

> As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive. Moreover, proving that the same decision would have been justified is not the same as proving that the same decision would have been made. An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The very premise of a mixed-motives case is that a legitimate reason was present. . . . The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

*Id.* at 252 (citations and quotations omitted). The employer must prove the mixed-motives defense by a preponderance of the evidence. *Id.* at 253.

After rendition of the *Price Waterhouse* decision, Congress amended Title VII through passage of the Civil Rights Act of 1991, so that currently under Title VII, an unlawful employment practice is established when the complaining party establishes that race, color, national origin, or sex was a motivating factor for any employment practice, even though other factors also motivated the practice. *See Garcia*, 201 F.3d at 676 (citing 42 U.S.C. § 2000e-2(m)). If, however, an employer can show that it would have taken the same action in the absence of the impermissible motivating factor, the plaintiff's relief is limited to injunctive and declaratory relief, costs, and attorney's fees. *Id.* (citing 42 U.S.C. § 2000e-5(g)(2)(B)(ii)).

*Analysis*

The Court finds Knee's trial testimony about his 2006 decision-making process credible and important in applying the law to the facts. Knee testified that absent consideration of race, he *likely* would have appointed Ortiz. Further, following this declaration, Knee offered a lengthy thoughtful

11

explanation about why his appointment of Ortiz would have been the same absent his consideration of race. Based on Knee's testimony, the Court finds that the overriding factor that motivated Knee's appointment of Ortiz was Knee's observation of Ortiz and officers under Ortiz's direct supervision at work in the community of Ortiz's command just before Knee made his 2006 appointments. In summary, Knee's testimony was that Ortiz carefully and in an exemplary manner addressed his command area's difficult community issues and its concerns, which arose following an incident during which a police officer shot a member of the community.

Defendants contend that Knee's testimony about Ortiz's skill and ability to relate so well to a suffering community, which was supported by testimony from other individuals at trial, establishes by a preponderance of the evidence the mixed-motives defense. Thus, Defendants contend that despite Knee's consideration of race, the legitimate, nondiscriminatory reason, that is Ortiz's community relations skills which Knee observed, standing alone would have induced Knee to make the same appointment decision.

Piatt contends that the record lacks contemporary, objective proof of Knee's legitimate motive for appointing Ortiz, which Piatt contends the Fifth Circuit requires for an employer to prevail on a mixed-motives defense. *See Garcia*, 201 F.3d at 677. Further, Piatt contends that Knee's testimony that he "likely" would have hired Ortiz absent his consideration of race fails to support a mixed-motives defense. Piatt contends that what is required is evidence that Knee "would have" hired Ortiz absent his consideration of race, and such evidence is lacking in the record.

Central to the parties' arguments is the Fifth Circuit's opinion, analysis, and holdings following a jury trial in *Garcia v. City of Houston*, 201 F.3d 672 (5th Cir. 2000). At issue in *Garcia* was the Houston Police Department's ("HPD") selection process used in transferring two African-

12

American officers and two Caucasian officers to the Special Weapons and Tactics team ("SWAT") and the decision not to transfer David Garcia, an Hispanic-American, to SWAT. *Id.* at 675. HPD officers considered a transfer to SWAT a promotion. In *Garcia*, the process for selecting officers for SWAT consisted of eight subjective and objective factors, including physical and written tests, evaluations by each applicant's current supervisor, interviews with SWAT team leaders, psychological testing, and a final evaluation. Although ultimately not transferred to SWAT, Garcia was selected as one of eleven finalists for the four positions. Garcia believed that the process was biased to favor the African-American officers, and that Garcia's evaluations in the objective and subjective tests were more favorable than those given to one Caucasian officer and both African-American officers who were ultimately selected. *Id.* Particularly, Garcia argued that the objective evidence, namely his test scores, which were higher than the two selected African-Americans' test scores, demonstrates that he was better qualified than the two selected African-American officers, thus race must have been the only factor in not selecting him for SWAT. *See* 201 F.3d at 677.

The jury found that race was a motivating factor in HPD's decision not to select Garcia for SWAT. *Id.* at 675. The jury also determined that HPD would have made the same decision even if it had not considered race. *Id.* During trial, HPD claimed that the reason Garcia was denied the promotion, without considering race, was that Garcia "had insufficient frontline and tactical police experience to justify a transfer to the SWAT detail." *Id.* Garcia had served as a community service officer for ten years during which time he had made few arrests. The African-American officers who were selected each testified that they had experience with the narcotics division and also performed tactical work such as undercover assignments. *Id.* The district court held that HPD proved by a preponderance of the evidence its mixed-motives defense. On appeal, Garcia contended that this

evidence was insufficient to sustain a mixed-motives defense as HPD failed to provide contemporary, objective evidence of its legitimate motive. *Id.* at 677.

The *Garcia* court turned to the Eighth Circuit's decision in *Foster v. University of Arkansas*, which held that objective evidence is "necessary" to establish that an employer would have made the same decision. *See Garcia*, 201 F.3d at 677 (citing *Foster v. University of Ark.*, 938 F.2d 111, 113 (8th Cir. 1991)). In reviewing the evidence, the Fifth Circuit focused on Garcia's testimony that for the past ten years he had been assigned to the community-service division and his only patrol experience during those years was overtime patrol work. Further, at the time of the selection process, it was noted in written records that Garcia's community-service assignment was "not deemed as an asset." The City also introduced evidence that the one Caucasian officer and the two African-American officers who had lower test scores all had previously been assigned to frontline tactical units such as narcotics, special operations, or tactical divisions. Also noted in Garcia's file was that in answering questions in his interview he tended wander and he received a mediocre evaluation from his supervisor. The Fifth Circuit concluded that based on the evidence about the overall selection process and Garcia's lack of frontline tactical experience, the evidence was sufficient to support the jury's verdict and sustain the mixed-motives defense. *Id.* at 677.

The Court finds that the selection process presented in *Garcia*, which included objective and subjective factors, to be different from Knee's discretionary appointment of Assistant Chiefs. The process here, unlike in *Garcia*, provides that Knee, alone, was to put together an administrative team for the Department. Knee's vision for his team was that it include individuals who had a variety of skills, with whom he could work well, and that together they could help the Department accomplish the goal of implementing Knee's idea of community policing. With regard to qualifications, it is

14

undisputed that the only qualifications required for an Assistant Chief were within the provisions of the Texas Local Government Code section 143.014(d), and that Piatt and Ortiz both met those qualifications.  It matters not whether Piatt was better qualified for the position than Ortiz.  Once both Piatt and Ortiz qualified under the Local Government Code, Knee was free to select either. Knee was free to balance the skills each individual possessed and determine whether Knee thought such skills were important in running the Department and the weight to give each.  The Court finds that the argument that Piatt was more qualified than Ortiz, even if proved, fails.

Other than the requirements of Texas Local Government Code section 143.014(d), it was within Knee's discretion to appoint those individuals whom Knee believed would best serve him as Chief and whom would best serve the Department as Assistant Chiefs.  The Court finds that Knee's appointment of Assistant Chiefs is similar to a political appointment, in that it is Knee alone who knows with whom he can work best to achieve his goals for the Department.  The Court finds that Knee's determination that Ortiz's exemplary skill in addressing a community under his command that was in distress and incensed about a police officer shooting a member of the community and Knee's observation of Ortiz and officers under his direct command bringing the community about to a peaceful state, to be legitimate nondiscriminatory reasons Knee appointed Ortiz as an Assistant Chief.  In fact, Knee would have been remiss not to consider the potentially volatile situation existing at the time he made the 2006 Assistant Chief appointments.

Considering Knee's discretionary appointment process and given that Knee testified he considered race a factor in making his Assistant Chief appointments, Defendants may prove a mixed-motives defense if Defendants can prove by a preponderance of the evidence that Knee's legitimate reason for hiring Ortiz—his skills in relating to and addressing communities—standing alone, would

have induced Knee to make the same hiring decision. *See Price Waterhouse*, 490 U.S. at 252. In reviewing the evidence, Knee testified that it was likely he would have hired Ortiz given Knee's observations of Ortiz in the community around the time Knee made the 2006 Assistant Chief appointments. Again, others testified about Ortiz's extraordinary skills in relating to the communities within his command and supervision. The Court finds that Knee's personal observations of Ortiz at work in the community at the time, which is supported by others who testified at trial, to be objective evidence defining Knee's decision absent his impermissible consideration of race. Knee came to the Department seeking to implement a community-focused policing scheme. Again, Knee had the right to choose his Assistant Chiefs from those qualified under the Texas Local Government Code. He was not required to rank applicants by other qualifications or abilities. The Court finds that the preponderance of the evidence proves Knee's legitimate nondiscriminatory reason for hiring Ortiz, that is Ortiz's abilities related to communities, standing alone, would have induced Knee to make the same decision absent Knee's consideration of race. Accordingly, as Defendants prevail on their mixed-motives defense, the Court will award Piatt his attorney's fees and costs. *See* 42 U.S.C. § 2000e-5(g)(B)(ii).

### *Section 1983 claims against the City and Knee*

Piatt also alleges claims of discrimination against the City and Knee as an individual. *See* 42 U.S.C. § 1983. In light of the Court's finding that Knee would have made the same appointment absent his consideration of race, Piatt's Section 1983 claim against Knee fails. The Court will render judgment that Piatt take nothing on his 1983 action against Knee in his individual capacity.

With regard to Piatt's Section 1983 claim against the City, to prevail Piatt must prove a policymaker, employing an official policy, was the moving force behind a constitutional violation.

*Monell v. Department of Soc. Sevs.*, 436 U.S. 658, 694 (1978).  Litigants must identify a municipal

policy-maker who has actual or constructive knowledge of an official policy or policy decision. *Jett*

*v. Dallas ISD*, 491 U.S. 701, 737 (1989).  A municipality can be liable under Section 1983 only

where a plaintiff establishes a constitutional deprivation resulting from the municipality's official

policy, practice, or custom. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997).

Piatt claims that the City has an unwritten policy of racial set-asides.  The City maintains that

is a conclusory allegation without any proof.  The Court agrees that the record lacks proof of the

allegation.  The Court will render judgment that Piatt take nothing on his Section 1983 claim against

the City.

### Conclusion

The Court holds that although in 2006 Knee considered race in appointing Assistant Chiefs,

Defendants have prevailed in proving by a preponderance of the evidence a mixed-motives defense

to Piatt's race-discrimination claims.   Specifically, the Court holds that Knee's legitimate

nondiscriminatory reason for appointing Ortiz, which was Ortiz's abilities to relate to members of

the community within his command, standing alone and absent Knee's consideration of race, would

have induced Knee to make the same appointment decision.  The Court also holds that Piatt take

nothing on his Section 1983 claim against Knee in his individual capacity.  Finally, no evidence

exists to support Piatt's claim that the City has an unwritten policy of racial set-asides.  Rather the

evidence reflects no such policy, unwritten or otherwise.  The Court holds that Piatt take nothing on his Section 1983 claim against the City.  The Court will render a separate Final Judgment.

SIGNED this **30th** day of September, 2010.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE